# MANDATE

FILED

2005 SEP 28 PH 2: 22

CLERK
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

*(handwritten, top right)* EDNY BKNY
01-CV-4386
Hon. Pohorelsky
Hon. Ross

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

---

## JUDGMENT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, Foley Square, in the City of New York, on the 1st day of September, two thousand and five.

Before:    Hon. Rosemary S. Pooler,
                Hon. Sonia Sotomayor,
                *Circuit Judges*
                Hon. Denny Chin,
                *District Judge\**

Docket No. 04-3230-cv

*(handwritten)* Respectfully Referred to Judge Pohorelsky for settlement and, if necessary, to oversee the preparation of a final order. So ordered.

*(stamp)* UNITED STATES COURT OF APPEALS · FILED · SEP 0 1 2005 · Roseann B. MacKechnie, CLERK · SECOND CIRCUIT

*(handwritten)* 10/3/05

ANTHONY P. CAPOBIANCO, Jr.,

                Plaintiff-Appellant,

    - v -

CITY OF NEW YORK and NEW YORK
CITY DEPARTMENT OF SANITATION,

                Defendants-Appellees.

*(handwritten)* cc: counsel
Judge Pohorelsky

Appeal from the United States District Court for the Eastern District of New York

This cause came on to be heard on the transcript of record from the United States District Court for the Eastern District of New York and was argued by counsel.

On consideration whereof, it is hereby ORDERED, ADJUDGED and DECREED that the judgment of said district court be and it hereby is REVERSED and the case is REMANDED for further proceedings in accordance with the opinion of this court.

*(stamp)* A TRUE COPY
Roseann B. MacKechnie, CLERK
by
DEPUTY CLERK

FOR THE COURT:
ROSEANN B. MACKECHNIE, Clerk
by

_____
Arthur W. Heller
Motions Staff Attorney

\* Denny Chin, United States District Judge for the Southern District of New York, sitting by designation.

ISSUED AS MANDATE: SEP 2 2 2005

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2004

Argued: June 24, 2005                    Decided: September 1, 2005

Docket No. 04-3230-cv

- - - - - - - - - - - - - - - - - - -

ANTHONY P. CAPOBIANCO, JR.,

                Plaintiff-Appellant,

                v.

CITY OF NEW YORK and NEW YORK
CITY DEPARTMENT OF SANITATION,

                Defendants-Appellees.

- - - - - - - - - - - - - - - - - - -

Before: POOLER and SOTOMAYOR, <u>Circuit Judges</u>,
        and Chin, <u>District Judge</u>.

    Appeal from a judgment of the United States District
Court for the Eastern District of New York (Allyne R. Ross,
<u>District Judge</u>) entered May 20, 2004 granting defendants-
appellees' motion for summary judgment and dismissing plaintiff-
appellant's complaint, which asserted claims of employment
discrimination under the Americans with Disabilities Act of 1990,
42 U.S.C. § 12101 <u>et</u> <u>seq.</u>, and state and city law.

    Reversed and remanded.

_____

    •    Denny Chin, United States District Judge for the
Southern District of New York, sitting by designation.

Daniel F. De Vita, Esq.,Garden City,
New York, for Plaintiff-Appellant.

Peter Rahbar, Esq., Proskauer Rose LLP,
New York, New York (Michael A.
Cardozo, Corporation Counsel of the
City of New York, and Kristin M.
Helmers, Assistant Corporation
Counsel, on the brief), for
Defendants-Appellees.

DENNY CHIN, District Judge.

In this case, plaintiff-appellant Anthony P.
Capobianco, Jr. was employed as a New York City sanitation
worker. He suffers from "congenital stationary night blindness,"
which prevents him from driving at night and makes it difficult
for him to see and function in dim light. The New York City
Department of Sanitation ("DOS") fired him, at least in part, as
a jury could find, because of the limitations imposed by his
medical condition.

Capobianco brought this action against DOS and the City
of New York (the "City"), alleging violations of the Americans
with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the
"ADA"), and state and city law. The district court granted
defendants' summary judgment motion and dismissed the complaint
because it concluded that no reasonable jury could find that
Capobianco was disabled or that defendants regarded him as being
disabled within the meaning of the ADA.

We reverse and remand for further proceedings.

- 2 -

## STATEMENT OF THE CASE

### A.    The Facts[1]

#### 1.    Capobianco Is Hired By DOS

Capobianco was employed by DOS from December 7, 1998 until November 4, 1999.  He was hired only after many years of trying to obtain employment with DOS, as he took the test to be a sanitation worker first in 1983 and again in 1990.  Although he obtained perfect scores both times, he was not called by DOS to be a sanitation worker until 1995.

In June 1995, as part of the pre-employment evaluation process, Capobianco filled out a DOS medical questionnaire.  He checked off "YES" for "Vision Problems," and added a note explaining: "Vision Problems:  Nearsighted."  He was given an eye examination and DOS advised him in August 1995 that it had determined that he was "NOT QUALIFIED" for the position of sanitation worker because of his "Visual deficit."  By letter dated August 25, 1995, he appealed the decision to the New York City Civil Service Commission.

In 1997, Capobianco underwent cataract surgery to improve his vision.  His doctor reported that Capobianco's vision had improved to 20/30 with both eyes together and 20/40 in each eye separately.  In July 1997, with his appeal apparently still

_____

[1]    The facts are construed in the light most favorable to Capobianco, as the non-moving party, with all factual ambiguities resolved and all reasonable inferences drawn in his favor.  See, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005).

- 3 -

pending, Capobianco wrote to the City, enclosing a letter from his doctor advising of the improvement. He asked DOS to give him another eye examination so that he could be appointed a sanitation worker.

DOS gave Capobianco another vision test on January 13, 1998. This time, DOS determined that Capobianco had "no visual deficit" and that he was "now medically qualified to perform the duties of a sanitation worker barring any other medical problems." On September 24, 1998, DOS sent Capobianco a notice advising him to report for pre-employment processing. He did so in October 1998, and was given another medical examination. He reported no medical or physical conditions that would interfere with his ability to perform the functions of the job, but did disclose that he had had cataract surgery. On October 5, 1998, Capobianco filled out another DOS medical questionnaire form. He again checked off "YES" for "Vision problems," and added the following explanation:

> Have been Nearsighted Since Birth. In April
> of 1997 I had Cataract Surgery in Both Eyes
> To improve my vision.

On December 7, 1998, Capobianco commenced employment with DOS as a sanitation worker. After classroom instruction and "hands on" training, he was assigned to work in a Queens garage. For the first month or so, he worked the day shift on a truck. This was a two-person operation, with one person driving the truck along a predetermined route and the other picking up

- 4 -

garbage and placing it into the back of the truck.  Capobianco performed both functions.

### 2.  <u>Capobianco Is Diagnosed with Night Blindness</u>

On January 27, 1999, shortly after he returned from a vacation, Capobianco was assigned to work an evening shift for the first time.  He drove a sanitation truck that night without incident, as he was able to follow another sanitation worker in another truck performing "relays," driving trucks that had been filled during the day shift and unloading them at a refuse transfer station.  The next night, he was assigned to a different location in Brooklyn.  While driving on an unfamiliar, dark route in the rain, he had difficulty seeing signs and lines on the road.  He returned to his garage in Queens and informed his supervisor of the problems he had experienced.  He had also developed a migraine headache, and the supervisor instructed him to go home sick.

Capobianco stayed home the next day.  When he returned to work, he visited the DOS medical clinic.  On February 1, 1999, he was placed on what is referred to within DOS as a "medical tissue":  he was assigned to light duty, with no driving.  For about two months thereafter, he was primarily assigned to clerical duties, with some garbage collection.  On March 16, 1999, a consulting neuro-ophthalmologist reported that Capobianco's "best corrected vision" was 20/40 and recommended further testing.  On March 18, 1999, the medical tissue was

- 5 -

changed to "no night driving," "day driving only."  There were no

other restrictions.

Capobianco was then examined by Dr. Scott Brodie at

Mount Sinai Medical Center, who, after performing a number of

tests, diagnosed "congenital stationary night-blindness."  In a

report to DOS dated April 9, 1999,[2] Dr. Brodie wrote:

> This is an inherited condition, present
> throughout life.  While there is no known
> treatment, Mr. Capobianco can be expected to
> retain his present level of visual function
> indefinitely.  The "night blindness" has been
> present since early childhood, and is not
> related to the recent cataract surgery or the
> size of the posterior capsulotomies.
>
> As a consequence of Mr. Capobianco's
> visual condition, it would not be advisable
> for him to drive at night, particularly a
> multi-ton vehicle.  Bad weather would of
> course further exaggerate the disability.  It
> would be appropriate for Mr. Capobianco to be
> placed on a duty schedule which avoids the
> need to drive at night.  During daylight
> conditions, there is no significant visual
> disability. ·

This was the first time Capobianco had been diagnosed with night

blindness.  On April 19, 1999, he was continued on a limited duty

tissue, "day driving only."

3.   **Capobianco Is Discharged**

---

[2]     The district court determined that this and another
report from Dr. Brodie were inadmissible as "unsworn statements"
and thus held that Capobianco could not rely on them to oppose
the summary judgment motion.  We conclude that this was error,
for the reasons discussed below, and thus we consider both of Dr.
Brodie's reports.

- 6 -

Until July 1999, DOS continued to assign Capobianco mostly to clerical work, even though he was capable of performing all duties during the day. For a period of time, from March 31, 1999 until the first week in May 1999, he was detached temporarily to Safety and Training and performed field training. One supervisor described his work as "terrific" and "outstanding," and he received a written commendation.

As of July 13, 1999, Capobianco was assigned to regular duty, days only, which included driving a truck as well as working the back of the truck. He performed these duties in a satisfactory manner. One of his supervisors, however, refused to rate Capobianco for two evaluation periods (December 7, 1998 to March 6, 1999 and March 7, 1999 to June 6, 1999), twice writing "unrateable" on the form. A different supervisor rated Capobianco's work "satisfactory," for the period June 7, 1999 to September 6, 1999.[3]

On July 27, 1999, Capobianco again was temporarily detached to Safety and Training. He assisted in the hiring of new DOS employees, performed administrative and clerical functions, and also drove DOS personnel to different locations, all during the day shift. He performed these duties satisfactorily, and one supervisor described him as an "outstanding worker" who did "everything well." He was still

---

[3]    There were only two possible ratings on the form: "satisfactory" and "unsatisfactory."

- 7 -

working in Safety and Training when he learned, in mid-October 1999, that he was being officially transferred to Safety and Training, effective October 17, 1999.

Notwithstanding the transfer order, on November 4, 1999, just two weeks later, Capobianco was informed by DOS that he was being fired. He was not given an explanation. He subsequently received a one-sentence letter dated November 8, 1999 that stated in its entirety:

> Your services as a Sanitation Worker are terminated under probation effective at the close of business on Thursday, November 4, 1999.

After he was dismissed, Capobianco was commended for his job performance in Safety and Training by the Director of Human Resources. Two weeks after his dismissal, he was given a Certificate of Achievement by the Director and Assistant Director of Safety and Training.

**4.   Capobianco's Medical Condition Is a Factor**

Internal DOS records show that Capobianco's medical condition was a factor in DOS's decision to terminate his employment. On June 11, 1999, the Personnel Management Division of DOS wrote to DOS Human Resources as follows:

> The Personnel Management Division recommends termination for probationary sanitation worker Anthony Copobianco [sic]. He is unable to perform in title duties of a sanitation worker due to Myopic Macular Degeneration. Mr. Copobianco [sic] was placed on a limited duty Medical Assignment by the Medical Division shortly after he was hired.

- 8 -

The head of the Personnel Management Division followed up in a memorandum to Human Resources dated July 14, 1999, questioning why Capobianco had not yet been fired:

> On June 11, 1999 I sent the attached letter to you recommending termination of [Capobianco] due to Myopic Macular Degeneration. The eye problem he has hampers his ability to perform the duties of sanitation workers, especially during the night time hours.
>
> If the disease is continuing to degenerate, why are [we] waiting to terminate him? Why did the clinic resume him [sic] to regular duties on a days only tissue?

On October 4, 1999, the Personnel Management Division requested that the Evaluation Review Board (the "ERB") of DOS meet to discuss Capobianco's "status." The ERB met and recommended "the termination of probationary Sanitation Worker A. Capobianco due to inability to sustain regular duty resulting from a permanent medical condition."

### 5.  Capobianco's Night Blindness

During discovery in the proceedings below, Capobianco designated Dr. Brodie of Mount Sinai as an expert witness. Dr. Brodie prepared a written expert's report, in the form of a letter dated July 1, 2003, which was produced to defendants in discovery. Dr. Brodie explained that Capobianco's night blindness:

> impacts all attempts at activities performed under conditions of dim light. It is extremely difficult for him to find a seat in a dark movie theater or restaurant. It is unsafe for him to walk, run, or ride a

- 9 -

> bicycle outdoors at night, except in the most
> familiar and well-lit surroundings.
> Independent excursions in the evening
> twilight must be planned with great care, or
> avoided altogether, due to the risk of his
> unexpectedly finding himself outdoors as
> night falls.  Nighttime outdoor recreation,
> such as campfires, or even a game of catch,
> must be severely curtailed.  Driving at night
> is impossible, a restriction which has
> effectively proscribed many opportunities for
> gainful employment which Mr. Capobianco might
> otherwise pursue as a holder of a valid
> commercial driver's license.

Dr. Brodie also noted that "[a]fter 20 minutes in darkness, Mr.

Capobianco requires more than 100 times as much light in order to

see as does a normally-sighted person."  Dr. Brodie also

explained that "[c]ongenital stationary night blindness is quite

rare, occurring in about 1 individual in 10,000."  Capobianco was

born with his night blindness and the condition is permanent and

"stationary":  it will not get better or worse with age.  The

condition cannot be corrected with surgery, glasses, contact

lenses, or other optical means.  Capobianco does not have "myopic

macular degeneration."

Capobianco's night blindness does not limit him in

performing the daily activities of his life, as long as the

lighting conditions are adequate.  For example, he is able to

care for his young daughter, including driving her to school in

the morning and picking her up at 5 p.m.  He is able to perform

typical household tasks such as housecleaning and routine chores,

including taking garbage to the curb at night and picking up at

night toys or other items left in the front yard.  He exercises

regularly, including walking, jogging, and playing tennis, and walks his dog both at night and during the day. He also has an extensive work history, and has been able to work as an ambulette driver, a security guard, a toll taker, a postal worker, and an office worker.

Capobianco is able to engage in these activities only during the day, except to the extent that he can take garbage to the curb or pick up toys in the front yard and the like at night because the outside of his home is well-lit and he has lived there for many years and the area is familiar to him. He cannot jog, bike, or even walk at night or in the early morning when it is still dark. Whenever he goes out at night, his wife or someone else must drive. Although he has a commercial driver's license, he is unable to take on any job that would involve driving at night or in dim light.

B.    **Prior Proceedings**

    1.    **The Administrative Proceedings**

On February 2, 2000, Capobianco filed a charge of discrimination against DOS with the Equal Employment Opportunity Commission (the "EEOC"). On December 13, 2000, the EEOC issued a written determination finding that there was "reasonable cause to believe that [Capobianco] was discriminated against in violation of the ADA." After efforts to conciliate were unsuccessful, the EEOC referred the matter to the United States Department of

- 11 -

Justice ("DOJ") on January 30, 2001.  On April 19, 2001,

Capobianco received a right-to-sue letter from DOJ.

## 2.   **The Proceedings Below**

Capobianco filed the action below on June 29, 2001, within 90 days after receipt of the right-to-sue letter. The complaint asserted claims under the ADA as well as the New York State Human Rights Law, N.Y. Exec. Law § 290 <u>et seq.</u>, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 <u>et seq.</u> He asserted claims for discrimination based on disability as well as a perception of disability.

After discovery, defendants moved for summary judgment. By an unpublished opinion and order filed May 17, 2004, the district court (Allyne R. Ross, <u>District Judge</u>) granted the motion in part and denied it in part. The district court dismissed the ADA claims, concluding that no reasonable jury could find that Capobianco was disabled or was regarded by defendants as being disabled within the meaning of the ADA. The district court did not reach the merits of Capobianco's state and city claims, noting that the term "disability" is defined more broadly under state and city law than under the ADA. The court nonetheless dismissed the state and city law claims as well, declining to exercise supplemental jurisdiction over those claims.

Judgment was entered on May 20, 2004 dismissing the action, and Capobianco filed a timely notice of appeal on June 4, 2004.

- 13 -

## DISCUSSION

### A.    Standard of Review

We review the district court's decision to exclude the two medical reports for abuse of discretion. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 141 (1997); <u>see also</u> <u>United States v. LaFlam</u>, 369 F.3d 153, 155 (2d Cir. 2004).

We review the district court's grant of summary judgment <u>de novo</u>. <u>Woodman</u>, 411 F.3d at 75; <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005). We may affirm only if we conclude that on the record presented, considered in the light most favorable to Capobianco, no reasonable jury could find in his favor on his claims under the ADA. <u>See</u> <u>Shannon v. New York City Transit Auth.</u>, 332 F.3d 95, 98-99, 103 (2d Cir. 2003).

### B.    The Medical Reports

In opposing defendants' summary judgment motion, Capobianco sought to rely on two reports from Dr. Brodie. The first was Dr. Brodie's letter dated April 9, 1999 addressed to the Medical Division of DOS. It was submitted to DOS while Capobianco was still an employee and was part of his employment file at DOS. The second was Dr. Brodie's letter dated July 1, 2003, addressed "To Whom It May Concern." During discovery Capobianco designated Dr. Brodie as his expert witness and the report was produced to defendants as part of Capobianco's expert disclosures, in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

- 14 -

The district court held that Dr. Brodie's letters were "inadmissible as unsworn statements and inadequate as a basis to oppose the defendants' motion for summary judgment."  As a general matter, it is correct that unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment. See Fed. R. Civ. P. 56(e); Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 391-92 (S.D.N.Y. 1998) (physician letters in ADA case); see also United States v. All Right, Title & Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.").  Nonetheless, here it was an abuse of discretion for the district court to exclude the two letters.

First, the letters were submitted not by Capobianco but by defendants, in support of their motion for summary judgment. They were attached as exhibits to defendants' Rule 56.1 Statement and were part of defendants' moving papers.  Defendants cited both letters and relied on them in seeking summary judgment. Hence, defendants waived any objections to the admissibility of the reports by offering them themselves.  See 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722, at 384-85 (3d ed. 1998) ("[U]ncertified or otherwise inadmissible documents may be considered by the court if not challenged.  The objection must

be timely or it will be deemed to have been waived.") (footnote omitted); see also Fed. R. Evid. 801(d)(2)(B) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth[.]"). Neither side objected to the admissibility of the reports, and, indeed, both sides relied on them.

Second, the district court's sua sponte decision to exclude the reports prejudiced Capobianco. Because defendants had submitted the reports initially, Capobianco reasonably believed that he could rely on them even though they were unsworn letters. With the reports apparently a part of the summary judgment record, and without notice that any issue existed as to their admissibility, Capobianco understandably did not obtain a sworn affidavit from Dr. Brodie, which presumably would have merely reiterated what was already in the letters. Had he been given notice that this was an issue, Capobianco could have obtained an affidavit easily, as Dr. Brodie had already been designated an expert and his expert report had previously been produced.

Third, the first report was not inadmissible hearsay in any event. It was a letter that Dr. Brodie had submitted to DOS while Capobianco was still employed by DOS. The letter was part of Capobianco's personnel file and apparently was considered by DOS as it was making its decision to discharge him. Hence, the

- 16 -

letter was admissible as evidence of DOS's state of mind. <u>See</u>
<u>Cameron v. Cmty. Aid for Retarded Children, Inc.</u>, 335 F.3d 60,
65-66 & n.2 (2d Cir. 2003) (holding in ADA case that out-of-court
statements made to supervisor by other employees complaining
about plaintiff were admissible to show supervisor's state of
mind and therefore were not hearsay).

Accordingly, the district court abused its discretion
by refusing <u>sua</u> <u>sponte</u> to consider Dr. Brodie's two reports.

C.   **The Merits**

1.   **Applicable Law**

The ADA prohibits discrimination against a "qualified
individual with a disability because of the disability" in the
"terms, conditions, and privileges of employment."  42 U.S.C. §
12112(a).  A plaintiff asserting a violation of the ADA must
prove that: (1) the defendant is covered by the ADA; (2)
plaintiff suffers from or is regarded as suffering from a
disability within the meaning of the ADA; (3) plaintiff was
qualified to perform the essential functions of the job, with or
without reasonable accommodation; and (4) plaintiff suffered an
adverse employment action because of his disability or perceived
disability.  <u>See</u> <u>Shannon</u>, 332 F.3d at 99; <u>Giordano v. City of New</u>
<u>York</u>, 274 F.3d 740, 747 (2d Cir. 2001).  Here, the district court
addressed only the second element, and thus we only address the

- 17 -

questions of whether Capobianco was disabled or was regarded by

defendants as being disabled within the meaning of the ADA.[4]

> A "disability" is:
>
> (A)  a physical or mental impairment that
> substantially limits one or more of the major
> life activities of such individual;
>
> (B)  a record of such an impairment; or
>
> (C)  being regarded as having such an
> impairment.

42 U.S.C. § 12102(2).  The existence of a disability must be

determined on a "case-by-case" basis.  <u>Toyota Motor Mfg., Ky.,</u>

<u>Inc. v. Williams</u>, 534 U.S. 184, 198 (2002).

Not every impairment is a "disability" within the

meaning of the ADA; rather, there are two requirements:  the

impairment must limit a major life activity and the limitation

must be substantial.  42 U.S.C. § 12102(2)(A).

"[M]ajor life activities" are "activities that are of

central importance to daily life."  <u>Toyota</u>, 534 U.S. at 197.  The

EEOC regulations define "major life activities" to include

"functions such as caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and

---

[4]    Defendants moved for summary judgment only on the
second and third elements.  Because the district court ruled in
defendants' favor on the second element, it did not reach the
third element.

- 18 -

working."  29 C.F.R. § 1630.2(i); see EEOC v. J.B. Hunt Transp.,
Inc., 321 F.3d 69, 74 (2d Cir. 2003).[5]

The regulations define the term "substantially limits"
to mean:

> (i)  Unable to perform a major life activity
> that the average person in the general
> population can perform; or
>
> (ii) Significantly restricted as to the
> condition, manner or duration under which an
> individual can perform a particular major
> life activity as compared to the condition,
> manner or duration under which the average
> person in the general population can perform
> that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Factors to consider in determining
whether a major life activity is substantially limited include:
the nature and severity of the impairment; its duration or
expected duration; and the existence of any actual or expected
permanent or long term impact.  Id. § 1630.2(j)(2); see Toyota,
534 U.S. at 196-97 ("'[S]ubstantially' in the phrase
'substantially limits' suggests 'considerable' or 'to a large
degree,'" and "thus clearly precludes impairments that interfere
in only a minor way with the performance of manual tasks from
qualifying as disabilities.") (alteration in original).
Moreover, the mere fact that an impairment requires an individual

---

[5]      In Toyota, the asserted major life activity was
performing manual tasks.  The Court held that for performing
manual tasks to constitute a major life activity -- to fall into
the same category as "such basic abilities as walking, seeing,
and hearing" -- the manual tasks in question had to be "central
to daily life."  534 U.S. at 197.

to perform a task differently from the average person does not

mean that she is disabled within the meaning of the ADA; rather,

there must be a significant restriction.  See Albertson's, Inc.

v. Kirkingburg, 527 U.S. 555, 564-65 (1999) (rejecting lower

court's "transforming 'significant restriction' into

'difference,'" thereby "undercut[ting] the fundamental statutory

requirement that only impairments causing 'substantial

limitat[ions] in individuals' ability to perform major life

activities constitute disabilities") (second alteration in

original).  The inquiry is not just on the effect an impairment

has on tasks associated with a specific job, but it must focus

primarily on whether the claimant is "unable to perform the

variety of tasks central to most people's daily lives."  Toyota,

534 U.S. at 200.  Finally, we must consider the effect of the

measures that the individual employs to mitigate or correct the

impairment.  See Albertson's, Inc., 527 U.S. at 565; Sutton v.

United Air Lines, Inc., 527 U.S. 471, 482 (1999).

        A plaintiff is also disabled within the meaning of the

ADA if he is "regarded" by his employer as having a physical or

mental impairment that substantially limits a major life

activity.  42 U.S.C. § 12102(2).  A "regarded as" claim "'turns

on the employer's perception of the employee' and is therefore 'a

question of intent, not whether the employee has a disability.'"

Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d

Cir. 1998) (quoting Francis v. City of Meriden, 129 F.3d 281, 284

- 20 -

(2d Cir. 1997)).  It is not enough that the employer perceive the employee as "somehow disabled"; the employer must regard the employee as "disabled within the meaning of the ADA," i.e., having an impairment that substantially limits a major life activity.  Id. at 646 (emphasis omitted); see Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004).

## 2.  Application

We address first the district court's ruling that Capobianco was not disabled within the meaning of the ADA as a matter of law and second the district court's ruling that defendants did not regard Capobianco as being disabled within the meaning of the ADA as a matter of law.

### a.  Capobianco's Disability

In the district court, Capobianco argued that his night blindness substantially limited two major life activities: seeing and working.  On appeal, he does not challenge the district court's conclusion that his night blindness did not substantially limit his major life activity of working. Accordingly, we address only the district court's ruling with respect to the major life activity of seeing, which was characterized by the Supreme Court in Toyota as a "basic abilit[y]."  534 U.S. at 197.

The district court held that no reasonable jury could find that Capobianco's night blindness substantially limited his major life activity of seeing.  We disagree, for the record

- 21 -

contains substantial evidence from which a jury could find that

Capobianco's impairment substantially limited his ability to see,

including the following:

First, as Dr. Brodie explained, congenital stationary

night blindness affects only 1 in 10,000 people, and after only

20 minutes in the darkness, Capobianco requires more than 100

times as much light to see as does a normally-sighted person.

Second, there is evidence in the record to show that

Capobianco's night blindness prevents him from driving at night

or in dim light, except in the most familiar and well-lit

surroundings.[6]   Although Capobianco has a commercial driver's

license, the condition also disqualifies him from jobs that would

involve driving at night or in dim light.   A jury could surely

---

[6]   The district court essentially rejected Capobianco's
sworn assertions that he was unable to drive at night because it
concluded that these assertions were inconsistent with
Capobianco's sworn deposition testimony that in or around 1990 he
drove 90% of the time when he and his wife went out after sunset.
Although there was an arguable inconsistency, there also was a
plausible explanation -- Capobianco did not learn that he had
night blindness until he was diagnosed with it by Dr. Brodie in
1999, and with increasing age his vision generally was
undoubtedly worse by then than it was in 1990.   The fact that he
might have driven at night in 1990 does not preclude the finding
that he cannot safely drive at night or in dim light now.   A jury
should be permitted to make this determination.   See Langman
Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 112 (2d Cir.
1998) ("If there is a plausible explanation for discrepancies in
a party's testimony, the court considering a summary judgment
motion should not disregard the later testimony because of an
earlier account that was ambiguous, confusing, or simply
incomplete.").

find that "the average person in the general population" can
drive at night.[7]  See 29 C.F.R. § 1630.2(j)(1)(ii).

Third, the record contains evidence to show that
Capobianco is unable to safely walk, run, or ride a bicycle
outdoors at night, except in the most familiar and well-lit
surroundings; he has extreme difficulty finding a seat in a dark
movie theater or restaurant; he must avoid altogether or plan
with great care independent excursions in the evening twilight,
lest he find himself outdoors alone as night falls; and he is
severely restricted in terms of outdoor nighttime activities in
general.  Although some of these activities are less important
than others, a reasonable jury could surely find that at least
some of these activities are of central importance to most
people's daily lives.[8]

_____

[7]     This Court has held that driving is not a major life
activity.  See Colwell, 158 F.3d at 643.  The major life activity
at issue here, however, is seeing, not driving.  In considering
the question whether Capobianco is substantially limited in the
major life activity of seeing, the inability to drive at night or
in dim light is relevant evidence of the extent of the
limitations on his ability to see.  We therefore consider the
inability to drive at night together with all of the other
evidence of the limitations and restrictions on Capobianco's
ability to see in determining that there is a genuine issue for
trial.

[8]     The district court found that "[j]ogging, riding a
bicycle, and playing sports outdoors are not nighttime
activities."  By doing so, the district court engaged in improper
fact-finding, without considering the evidence in the light most
favorable to Capobianco as the party opposing summary judgment.
Many reasonable jurors could find that running, biking, and
certain other outdoor sports are nighttime activities.

- 23 -

Fourth, the factors to be considered under the EEOC regulations at least arguably support the conclusion that the limitation is substantial, as the record contains evidence that: the impairment severely limits Capobianco's ability to see at night or in dim light; the impairment cannot be corrected by surgery, glasses, contact lenses, or other optical means; and the impact is permanent. See 29 C.F.R. § 1630.2(j)(2).[9]

A jury could surely find, from this combination of circumstances, that Capobianco's night blindness significantly restricts the manner in which he can see as compared to the "average person in the general population." Seeing is a fundamental life activity of central performance, and the average person can see and function at night and in dim light. A reasonable jury could find that driving, walking, running, biking, and engaging in other outdoor activities and excursions are important activities in the lives of most people and that the inability to engage in these activities at night or in dim light (which can encompass fourteen hours of the day in our part of the world) is not just a difference in sight but a severe

---

[9]    Nor is there any evidence of mitigation of the impairment itself. If an individual takes measures to correct or ameliorate her impairment, "the effects of those measures -- both positive and negative -- must be taken into account when judging whether that person is 'substantially limited' in a major life activity." Sutton, 527 U.S. at 482. In this context, mitigation refers to amelioration of the impairment itself, not simple avoidance of activities affected by the impairment. Here, there is evidence that Capobianco generally relies on others to drive him at night or in dim light, but this effort does not alter or improve his ability to see in such conditions.

- 24 -

restriction, <u>i.e.</u>, a substantial limitation, on the ability to
see.

There is little case law on the issue of whether an
individual with night blindness is disabled within the meaning of
the ADA.   In <u>Bancale v. Cox Lumber Co.</u>, No. 97-113-Civ-FTM-25D,
1998 WL 469863 (M.D. Fla. May 18, 1998), the court granted
summary judgment dismissing an ADA claim where the plaintiff's
night blindness prevented him from driving at night but there was
"simply no record evidence that any other activities are affected
at night."   1998 WL 469863, at *3; <u>see also</u> <u>Schwarz v. Northwest</u>
<u>Iowa Cmty. Coll.</u>, 881 F. Supp. 1323, 1342-44 (N.D. Iowa 1995)
(rejecting night blindness disability claim under Iowa law).
Other plaintiffs asserting visual impairment claims under the ADA
have not fared well.   <u>See, e.g.</u>, <u>Shannon</u>, 332 F.3d at 99-103
(affirming grant of summary judgment dismissing "regarded as" ADA
claim brought by bus driver who was color blind); <u>EEOC v. United</u>
<u>Parcel Serv., Inc.</u>, 306 F.3d 794, 803 (9th Cir. 2002) (affirming
grant of summary judgment dismissing disability claims of
"monocular" individuals whose vision impairments did not keep
them from driving, reading, using tools, and playing sports,
finding no substantial limitation on major life activity of
seeing); <u>cf.</u> <u>Sherman v. Peters</u>, 110 F. Supp. 2d 194, 199-200
(W.D.N.Y. 2000) (granting summary judgment dismissing claim under
Rehabilitation Act brought by plaintiff who had lost one eye).

In the end, however, these cases are of little help, for the Supreme Court has instructed that the determination of the existence of a substantial limitation on a major life activity must be determined on a case-by-case basis.   An individualized assessment is necessary.   See Toyota, 534 U.S. at 198, 199; Albertson's, 527 U.S. at 566-67.   Here, Capobianco's specific assertions, Dr. Brodie's reports, and the other evidence in the record are sufficient to present a genuine issue of fact for trial.

### b.   Capobianco's Perceived Disability

The district court also held that Capobianco failed to present evidence from which a reasonable jury could find that defendants regarded him as being disabled within the meaning of the ADA.   The district court concluded that even though defendants perceived Capobianco as having a medical condition that required putting him on a medical tissue, that showed only that DOS believed he was unable to drive at night, and was insufficient to show that DOS regarded him as having an impairment that substantially limited a major life activity.

In fact, the record contains substantial evidence, including direct evidence, that DOS perceived Capobianco as being disabled within the meaning of the ADA.   DOS placed Capobianco on a medical tissue that prohibited all driving, not just night driving.   Moreover, for some two months DOS permitted Capobianco to perform only clerical and similar duties, even though he was

- 26 -

fully capable of performing all sanitation worker duties during the day.  A supervisor refused to evaluate Capobianco for two performance periods, writing "unrateable" on the form, even though he was able to perform the duties in a satisfactory manner, as he showed in the subsequent period when a different supervisor did rate him.  A jury could find that DOS regarded -- incorrectly -- Capobianco as being unable to drive at any time because he was substantially limited in his ability to see at night or in dim light and as being unable to perform anything other than clerical or other light duties.

In addition, the Personnel Management Division recommended, in writing, that Capobianco be discharged on the asserted belief that he was "unable to perform in title duties of a sanitation worker due to Myopic Macular Degeneration."[10]  Of course, Capobianco did not even have myopic macular degeneration, and the record contains substantial evidence to show that he was able to perform the "in title duties of a sanitation worker," with the exception of driving at night.  The Personnel Management

---

[10]     "Macular degeneration" is a "loss of central vision in both eyes produced by pathological changes in the macula lutea [a small area lying slightly lateral to the center of the retina] and characterized by spots of pigmentation or other abnormalities."  Webster's Medical Desk Dictionary at 403 (1986).  "Myopic" means relating to or exhibiting myopia, a condition in which the visual image comes to a focus in front of the retina, causing nearsightedness.  Id. at 461; see also White v. Orange Auto Ctr., 101 F. Supp. 2d 485, 487, 494-95 (E.D. Tex. 2000) (issue of fact existed as to whether plaintiff who suffered from "poor vision, cataracts, and macular degeneration disease" was disabled within meaning of ADA).

- 27 -

Division was also apparently under the mistaken impression that
Capobianco's "disease is continuing to degenerate," and asked:
"why are [we] waiting to terminate him?"  In the end, the ERB
recommended Capobianco's discharge "due to [his] inability to
sustain regular duty resulting from a permanent medical
condition."  A jury could surely find from this evidence that DOS
perceived Capobianco as having a degenerating impairment that
prevented him from doing much more than merely driving at night,
and that DOS believed that Capobianco's condition substantially
limited his ability to see as compared to the average person in
the general population.

For some fifteen years Capobianco tried to obtain
employment as a New York City sanitation worker.  Unfortunately
when he finally succeeded, he was diagnosed with night blindness.
Nonetheless, the record suggests that he was fully capable of
performing the job, with the seemingly reasonable accommodation
that he not be required to drive at night.[11]  Indeed, he was able

---

[11]     The question of whether Capobianco was qualified for
the job, with or without reasonable accommodation, remains an
issue for trial.   The record contains evidence from which a jury
could conclude that night driving is not an essential function of
the position of sanitation worker.  For example, the sanitation
worker job description makes no mention of night driving, the job
description in the notice of examination states that employees
"may" be assigned to night shifts, and the seniority system of
the collective bargaining agreement in question seems to
contemplate that most senior employees can avoid night shifts
entirely.   See Rodal v. Anesthesia Group of Onondaga, P.C., 369
F.3d 113, 121 (2d Cir. 2004) (holding that although doctors in
defendant group were expected to perform night duty, a conclusion
that night duty was essential was not justified on motion for
summary judgment, in light of evidence presented).

to perform satisfactorily on this basis for some time.
Alternatively, he could have been placed in a position that did
not require night driving, and in fact, just before he was
discharged, he was transferred to the Safety and Training unit
where he had been excelling on a temporary basis for several
months.   Instead of considering whether Capobianco's condition
could be accommodated, DOS fired him, explicitly because of his
medical condition, apparently based on the mistaken belief that
Capobianco's condition was degenerating and that the condition
prevented him from performing the duties of a sanitation worker.

Congress enacted the ADA because "'society's
accumulated myths and fears about disability and disease are as
handicapping as are the physical limitations that flow from
actual impairment.'"  Sutton, 527 U.S. at 489 (quoting School Bd.
of Nassau County v. Arline, 480 U.S. 273, 284 (1987)).   It would
seem that this observation applies here.

## CONCLUSION

The judgment of the district court is reversed and the
case is remanded for further proceedings consistent with this
decision.